No. 22-11717

In the

# United States Court of Appeals

## For the Eleventh Circuit

———————————

Sprint Communications LLC,

*Plaintiff-Appellee,*

v.

Retrobrands USA LLC, et al.

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court for
the Southern District of Florida, Case No. 0:18-cv-60788
Honorable Jose E. Martinez

———————————

### APPELLEE'S ANSWERING BRIEF

———————————

Lucy Jewett Wheatley
Amanda L. DeFord
Claire Hagan Eller
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219

Marjorie G. McLean
McGuireWoods LLP
201 North Tryon Street
Suite 3000
Charlotte, NC 28202

Jonathan Y. Ellis
McGuireWoods LLP
501 Fayetteville Street
Suite 500
Raleigh, NC 27601
(919) 755-6688
jellis@mcguirewoods.com

*Sprint Communications LLC v. Retrobrands USA, LLC, et al.*

Case No. 22-11717

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellee Sprint Communications LLC, pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, certifies that in addition to the persons and entities listed in Appellants' CIP and Corporate Disclosure Statement included in their February 14, 2023 Amended Opening Brief, the following persons and entities also have an interest in the outcome of this case:

1.    Eller, Claire H. (Counsel for Plaintiff-Appellee)

2.    McLean, Marjorie G. (Counsel for Plaintiff-Appellee)

Sprint Communications LLC is an indirect wholly-owned subsidiary of Sprint LLC.

On December 31, 2021, Sprint Corporation converted to a limited liability company and is now Sprint LLC, which is a direct wholly-owned subsidiary of T-Mobile USA, Inc.

T-Mobile USA, Inc., a Delaware corporation, is a direct wholly-owned subsidiary of T-Mobile US, Inc., a Delaware corporation.

T-Mobile US, Inc. (NASDAQ: "TMUS") is a publicly-traded company listed on the NASDAQ Global Select Market of NASDAQ Stock Market LLC ("NASDAQ").

C-1 of 3

*Sprint Communications LLC v. Retrobrands USA, LLC, et al.*
Case No. 22-11717

Deutsche Telekom Holding B.V., a limited liability company (besloten vennootschap met beperkte aansprakelijkheidraies) organized and existing under the laws of the Netherlands ("DT B.V."), owns more than 10% of the shares of T-Mobile US, Inc.

DT B.V. is a direct, wholly-owned subsidiary of T-Mobile Global Holding GmbH, a Gesellschaft mit beschränkter Haftung organized and existing under the laws of the Federal Republic of Germany ("Holding").

Holding, is in turn a direct, wholly-owned subsidiary of T-Mobile Global Zwischenholding GmbH, a Gesellschaft mit beschränkter Haftung organized and existing under the laws of the Federal Republic of Germany ("Global").

Global is a direct, wholly-owned subsidiary of Deutsche Telekom AG (OTCQX: "DTEGY"), an Aktiengesellschaft organized and existing under the laws of the Federal Republic of Germany ("Deutsche Telekom").

The principal trading market for Deutsche Telekom's ordinary shares is the trading platform "Xetra" of Deutsche Börse AG. Deutsche Telekom's ordinary shares also trade on the Frankfurt, Berlin, Düsseldorf, Hamburg, Hannover, München and Stuttgart stock

*Sprint Communications LLC v. Retrobrands USA, LLC, et al.*
Case No. 22-11717

exchanges in Germany. Deutsche Telekom's American Depositary Shares ("ADSs"), each representing one ordinary share, trade on the OTC market's highest tier, OTCQX International Premier (ticker symbol: "DTEGY").

Dated: April 17, 2023          */s/ Jonathan Y. Ellis*
                               Jonathan Y. Ellis

                               *Counsel for Plaintiff-Appellee*
                               *Sprint Communications LLC*

## STATEMENT REGARDING ORAL ARGUMENT

Sprint Communications LLC does not request oral argument. The disputed issues of law and fact are straightforward, and Sprint does not expect that oral argument would materially assist the Court in resolving this appeal. If the Court prefers to hear oral argument, however, Sprint will readily participate.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT ....................................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF CITATIONS ...................................................................... iv

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ........................................................ 4

STATEMENT OF THE ISSUES ............................................................ 4

STATEMENT OF THE CASE ............................................................... 5

I.      Factual Background ..................................................................... 5

        A.      Sprint's Acquisition and Use of the Nextel Branding in
                the Push-to-Talk Industry ................................................ 5

                1.      The NEXTEL and Chirp Marks .................................. 5

                2.      The Origin and Growth of the Nextel Brand ............... 6

                3.      Sprint Acquires Nextel and Navigates Changes in
                        the Mobile Services Industry .................................... 7

                4.      Sprint's Continuous Use of the Nextel Brand ........... 10

        B.      The Defendants' Unlawful Use of the Nextel Branding ..... 12

                1.      Calabrese Launches a New Company Using
                        NEXTEL .............................................................. 12

                2.      Calabrese's Use of NEXTEL Confuses Attendees
                        of the 2017 IWCE Trade Show .................................. 13

                3.      Calabrese Assures Sprint He Has Stopped
                        Infringing, While He and Kaplan Grow their
                        Counterfeit Business ............................................... 15

                4.      Kaplan and Calabrese Build their Unauthorized
                        NEXTEL Business .................................................. 18

II.     Procedural History ..................................................................... 22

III.    Standards of Review ................................................................... 24

SUMMARY OF ARGUMENT ................................................... 26

ARGUMENT ........................................................................ 30

I.   Sprint Has Article III Standing to Pursue the Claims on
     Which the District Court Awarded $4.5 Million in Damages ...... 30

II.  Appellants Provide No Sound Basis to Vacate the Jury's
     Liability Findings ........................................................ 35

     A.   Sprint Never Abandoned the NEXTEL and Chirp
          Marks ............................................................... 35

          1.   Trademark Defendants Face a Heavy Burden to
               Prove Abandonment .................................... 36

          2.   The Evidence Demonstrates Sprint's Continuous
               Use of the NEXTEL and Chirp Marks....................... 37

          3.   Appellants' Abandonment Arguments Lack Merit .... 41

     B.   The Evidence Supports the Cybersquatting Verdict........... 47

     C.   The Evidence Supports the Dilution Verdict....................... 49

III. Appellants Provide No Sound Basis to Vacate the Damages
     Award ..................................................................... 54

     A.   Sprint Timely Elected Statutory Damages........................ 54

     B.   The Evidence Supports the Jury's Damages Finding
          that Appellants Earned $400,000 in Profits ..................... 57

     C.   The Statutory Damages Award Does Not Violate Due
          Process ............................................................. 59

IV.  The District Court Did Not Abuse Its Discretion Granting
     Injunctive Relief Against Further Infringement ......................... 61

     A.   The District Court Retained Jurisdiction to Grant the
          Permanent Injunction............................................. 62

     B.   The District Court Did Not Abuse Its Discretion in
          Granting the Injunction....................................... 64

CONCLUSION .................................................................. 68

# TABLE OF CITATIONS

**Page(s)**

## Cases

*adidas Am., Inc. v. Sketchers USA, Inc.*,
  890 F.3d 747 (9th Cir. 2018) .................................................................. 51

*American Photographic Publishing Co. v. Ziff-Davis*
  *Publishing Co.*,
  135 F.2d 569 (7th Cir. 1943) .................................................................. 46

*\*Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*,
  522 F.3d 1200 (11th Cir. 2008) ........................................................ 64, 67

*Arbaugh v. Y&H Corp.*,
  546 U.S. 500 (2006) ................................................................................ 34

*Audi AG v. D'Amato*,
  469 F.3d 534 (6th Cir. 2006) .................................................................. 51

*Bentley Motors Ltd. v. McEntegart*,
  976 F. Supp. 2d 1297 (M.D. Fla. 2013) ................................................ 53

*Blue Bell, Inc. v. Farah Mfg. Co.*,
  508 F.2d 1260 (5th Cir. 1975) ................................................................ 45

*Blumenthal Distrib., Inc. v. Herman Miller, Inc.*,
  963 F.3d 859 (9th Cir. 2020) .................................................................. 52

*Bochese v. Town of Ponce Inlet*,
  405 F.3d 964 (11th Cir.), *cert. denied*, 546 U.S. 872 (2005) .............. 24

*Broadcast Music, Inc. v. Evie's Tavern Ellenton, Inc.*,
  772 F.3d 1254 (11th Cir. 2014) ............................................................. 26

*Burger King Corp. v. Mason*,
  855 F.2d 779 (11th Cir. 1988) ............................................................... 26

*Capitol Records, Inc. v. Thomas-Rasset*,
  692 F.3d 899 (8th Cir. 2012) ................................................................. 61

*Carpenters Indep. Council v. Zinke*,
854 F.3d 1 (D.C. Cir. 2017) ................................................................. 32

*Centerline Equip. Corp. v. Banner Personnel Serv., Inc.*,
545 F. Supp. 2d 768 (N.D. Ill. 2008) .................................................... 61

*Chanel, Inc. v. Makarczyk*,
110 U.S.P.Q. 2d 2013 (T.T.A.B. 2014) ................................................. 53

*Christopher v. Florida*,
449 F.3d 1360 (11th Cir. 2006) ............................................................. 25

*Conversive, Inc. v. Conversagent, Inc.*,
433 F. Supp. 2d 1079 (C.D. Cal. 2006) ................................................ 34

*\*Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*,
304 F.3d 1167 (11th Cir. 2002) ..................................................... 36, 37

*Edge Sys. LLC v. Aguila*,
186 F. Supp. 3d 1330 (S.D. Fla. 2016) ................................................. 67

*\*Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*,
458 F.3d 931 (9th Cir. 2006) ........................................................ 37, 44

*\*Feltner v. Columbia Pictures Television, Inc.*,
523 U.S. 340 (1998) ............................................................. 28, 55, 56

*General Television Arts, Inc. v. Southern Ry. Co.*,
725 F.2d 1327 (11th Cir. 1984) ............................................................. 63

*Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*,
82 F.3d 1533 (10th Cir. 1996) .............................................................. 63

*Herman Miller, Inc. v. Belnick LLC*,
510 F. Supp. 3d 1342 (N.D. Ga. 2021) ................................................ 52

*Hiland Potato Chip Co. v. Culbro Snack Foods, Inc.*,
720 F.2d 981 (8th Cir. 1983) ................................................................ 42

*Hoop Culture, Inc. v. Gap Inc.*,
648 F. App'x 981 (11th Cir. 2016) ....................................................... 66

*Jacobsen v. Fla. Sec'y of State*,
  974 F.3d 1236 (11th Cir. 2020).................................................... 24, 31

*Jordan v. Time, Inc.*,
  111 F.3d 102 (11th Cir. 1997)............................................................ 57

*Lazar v. Cecilia Co.*,
  30 F. Supp. 769 (S.D.N.Y. 1939)....................................................... 34

*Liberty Mut. Ins. Co. v. Wetzel*,
  424 U.S. 737 (1976) ........................................................................... 63

*Lujan v. Defs of Wildlife*,
  504 U.S. 555 (1992) ..................................................................... 26, 31

*Malletier v. Dooney & Bourke, Inc.*,
  561 F. Supp. 2d 368 (S.D.N.Y. 2008)........................................... 52, 53

*MasterCard Int'l Inc. v. Trehan*,
  629 F. Supp. 2d 824 (N.D. Ill. 2009)................................................ 50

*Mister Donut of Am., Inc. v. Mr. Donut, Inc.*,
  418 F.2d 838 (9th Cir. 1969)............................................................. 34

*MSPA Claims 1, LLC v. Tenet Fla., Inc.*,
  918 F.3d 1312 (11th Cir. 2019).......................................................... 32

*Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*,
  671 F.3d 526 (5th Cir. 2012)............................................................. 49

*Nat'l Min. Co. v. Bourjois, Inc.*,
  62 F.2d 1 (7th Cir. 1932)................................................................... 34

*Nguyen v. Biondo*,
  508 F. App'x 932 (11th Cir. 2013) .................................................... 36

*Olem Shoe Corp. v. Wash. Shoe Corp.*,
  591 F. App'x 873 (11th Cir. 2015) .................................................... 56

*Pasco v. Protus IP Sols., Inc.*,
  826 F. Supp. 2d 825 (D. Md. 2011).................................................... 60

*Proctor v. Fluor Enters., Inc.*,
   494 F.3d 1337 (11th Cir. 2007) ........................................................ 25

*Ramada Inns, Inc. v. Gadsden Motel Co.*,
   804 F.2d 1562 (11th Cir. 1986) ....................................................... 57

*Ramirez v. Sec'y, U.S. Dep't of Transp.*,
   686 F.3d 1239 (11th Cir. 2012) ....................................................... 35

*In re Rasbury*,
   24 F.3d 159 (11th Cir. 1994) .......................................................... 26

*Rideau v. Keller Indep. School Dist.*,
   819 F.3d 155 (5th Cir. 2016) .......................................................... 33

*Royal Palm Props., LLC v. Pink Palm Props., LLC*,
   950 F.3d 776 (11th Cir. 2020) ........................................................ 32

*\*SM Kids, LLC v. Google LLC*,
   963 F.3d 206 (2d Cir. 2020) ..................................................... 33, 34

*\*Smith v. Thomas*,
   911 F.3d 378 (6th Cir. 2018) .......................................................... 54

*Sony BMG Music Ent. v. Tenenbaum*,
   719 F.3d 67 (1st Cir. 2013) ....................................................... 60, 61

*Specht v. Google, Inc.*,
   747 F.3d 929 (7th Cir. 2014) .......................................................... 46

*Speech First, Inc. v. Cartwright*,
   32 F.4th 1110 (11th Cir. 2022) ................................................... 24, 31

*Sream, Inc. v. Barakat Food, Inc.*,
   No. 16-cv-24722, 2017 WL 7792613 (S.D. Fla. Oct. 4, 2017) ............ 67

*\*St. Louis, I.M. & S. Ry. Co. v. Williams*,
   251 U.S. 63 (1919) .................................................................. 59, 61

*Swatch AG v. Beehive Wholesale, LLC*,
   739 F.3d 150 (4th Cir. 2014) .......................................................... 49

*Thane Int'l v. Trek Bicycle Corp.*,
    305 F.3d 894 (9th Cir. 2002)..................................................................52

*Thompson v. Haynes*,
    305 F.3d 1369 (Fed. Cir. 2002) ...........................................................59

*TracFone Wireless, Inc. v. Adams*,
    98 F. Supp. 3d 1243 (S.D. Fla. 2015) ..................................................67

*Turner v. Soc. Sec. Admin., Comm'r*,
    No. 21-13590, 2022 WL 842188 (11th Cir. Mar. 22, 2022) ...............66

*U.S. Commodity Futures Trading Comm'n v. S. Trust*
    *Metals, Inc.*,
    894 F.3d 1313 (11th Cir. 2018)....................................................26, 64

*\*United States v. Ross*,
    963 F.3d 1056 (11th Cir. 2020)....................................................33, 34

*Virtual Studios, Inc. v. Beaulieu Grp., LLC*,
    987 F. Supp. 2d 769 (E.D. Tenn. 2013) ..............................................61

*W.H. Childs & Son v. G. Sidenberg & Co.*,
    11 F.2d 463 (D.C. Cir. 1926) ..............................................................34

*Walter Int'l Prods., Inc. v. Salinas*,
    650 F.3d 1402 (11th Cir. 2011) ..........................................................25

*Williams v. First Advantage LNS Screening Solutions, Inc.*,
    947 F.3d 735 (11th Cir. 2020) ............................................................25

*Yellow Pages Photos, Inc. v. Ziplocal, LP*,
    846 F.3d 1159 (11th Cir. 2017)..........................................................25

*\*Zomba Enterprises, Inc. v. Panorama Records, Inc.*,
    491 F.3d 574 (6th Cir. 2007)..............................................................60

**Statutes**

15 U.S.C. § 1060...........................................................................................33

15 U.S.C. § 1116(a) ......................................................................................65

15 U.S.C. § 1117....................................................... 28, 54, 55, 56, 57, 58, 59

15 U.S.C. § 1125........................................................................... 47, 48, 49

15 U.S.C. § 1127...................................................... 27, 34, 36, 37, 45

28 U.S.C. § 1291............................................................................. 4, 63

28 U.S.C. § 1331.................................................................................... 4

28 U.S.C. § 1367.................................................................................... 4

## Other Authorities

20 Moore's Federal Practice – Civil § 303.32 (2022) ............................... 63

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (4th ed. 2001) ................................................. 36

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (5th ed. 2023) .......................................... 43, 45

R. Reilly,
*SFAS Nos. 141 and 142 Implications for Goodwill Acquired by M&A,*
Am. Bankruptcy Institute J. 48 (Feb. 2006) ....................................... 43

## INTRODUCTION

Appellant Jeffrey Kaplan's company, Retrobrands USA LLC, is in the business of reviving famous, but abandoned, brands.  In 2017, Kaplan entered into a licensing agreement with co-defendant Stephen Calabrese to "revive" Sprint's "famous and iconic trademark NEXTEL" and then sell the company within five years for "possibly hundreds of millions of dollars."  Dkt.314-39 at 17.[1]  Nextel—the gold-standard in push-to-talk mobile services—was a highly attractive and valuable target.  Trouble is Sprint never abandoned Nextel, and Appellants (and their co-defendants) knew it.

Sprint has been using the Nextel brand to market push-to-talk mobile devices and services continuously since merging with Nextel Communications, Inc. in 2005.  Nextel devices and services have been particularly popular with first responders and other enterprise customers—some of the very customer segments that Appellants targeted with their new venture.  By the time Kaplan entered the

---

[1] "Dkt.__" citations are to the district court docket.  Citations to record pages are to the page numbers that appear in the header generated by the court's ECF system.  Citations to transcripts use the page and line numbers assigned by the court reporter.

agreement with Calabrese, Sprint had already sent two cease-and-desist letters to Calabrese (who falsely told Sprint he had stopped using the mark). Kaplan was aware of the letters and had discovered through his own research that Sprint had recently renewed its rights in the NEXTEL trademark with the U.S. Patent and Trademark Office ("USPTO").

After discovering Appellants' unlawful scheme, Sprint brought this suit asserting claims of trademark infringement, counterfeiting, unfair competition, cybersquatting, and trademark dilution. It requested statutory damages and, in the alternative, the disgorgement of the defendants' profits. After a week-long trial, the jury found for Sprint on every count. The district court entered a monetary award of $4.5 million in statutory damages and a permanent injunction to prevent Appellants' continuing acts of infringement. The jury's verdict is well-supported by the evidence, and Appellants provide no sound basis to disturb the award of monetary and injunctive relief.

Sprint plainly has Article III standing to pursue the claims against Appellants based on their blatant infringement of Sprint's trademark rights, which even Appellants concede has caused harm of over $38,000.

Appellants' contrary arguments conflate the standing inquiry and the merits and are unpersuasive.

Appellants provide no persuasive reason to vacate the jury's liability findings. They principally argue that Sprint abandoned the Nextel trademarks at some unspecified point before their scheme began. But the evidence presented at trial showed Sprint's continuous use of the trademarks, most recently at trade shows, business-to-business sales presentations, and on the packaging for rugged mobile devices designed for first responders and other consumers with similarly demanding needs. The jury rejected Appellants' implausible contrary reading of the evidence, and there are no grounds to second guess that finding.

Finally, Appellants provide no persuasive reason to vacate the award of monetary or injunctive relief. Sprint timely requested statutory damages from the outset of this case, presented that request to the jury, and appropriately asked the district court after the verdict to award only statutory damages, not duplicative disgorgement damages. As for the permanent injunction, the court neither mistakenly (and prematurely) denied Sprint's request for injunctive relief nor abused its discretion in enjoining Appellants from continuing to infringe Sprint's trademarks—

particularly given Appellants' admission that they continued their unlawful scheme even after the verdict.

This Court should affirm the final judgment in every respect.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Sprint's Lanham Act claims under the federal question statute, 28 U.S.C. § 1331, and supplemental jurisdiction over Sprint's state-law claims under 28 U.S.C. § 1367. This Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's final judgment granting Sprint monetary and injunctive relief.

## STATEMENT OF THE ISSUES

I.  Whether Sprint has Article III standing to pursue its claims against Appellants.

II.  Whether sufficient evidence supports the rejection of Appellants' abandonment defense.

III.  Whether sufficient evidence supports the jury's finding that Sprint's NEXTEL Mark was "famous."

IV.  Whether the district court abused its discretion in affirming the jury's statutory damages award.

V.  Whether the district court abused its discretion in granting Sprint's motion for a permanent injunction against further infringement.

4

## STATEMENT OF THE CASE

### I.     Factual Background

#### A.     Sprint's Acquisition and Use of the Nextel Branding in the Push-to-Talk Industry

Sprint and its predecessors have spent more than 30 years making the Nextel brand the gold-standard in push-to-talk communications. Dkt.298 at 68:23-24 (Kohman); Dkt.298 at 109:12-14 (Wiley). Push-to-talk phones operate like walkie-talkies, offering instant communication over cellular networks. Dkt.298 at 67:11-15 (Kohman). Rather than dialing a phone, you simply press a button, speak, and everyone in your group instantly hears you. Dkt.298 at 67:11-15 (Kohman).

##### 1.     *The NEXTEL and Chirp Marks*

Sprint primarily uses two marks, both at issue in this case, in its push-to-talk business: the word mark NEXTEL and a sound mark of a distinctive "chirp" tone (collectively, "the Nextel Branding"). Dkt.298 at 178:1-20 (Shaughnessy); Dkt.314-17. Sprint owns an incontestable registration in the NEXTEL word mark for mobile devices, as well as common law rights for mobile devices and telecommunications services (collectively, "the NEXTEL Mark"). Dkt.314-47; Dkt.298 at 111:15-17, 119:9-25, 124:8-23 (Wiley). It also owns a federal registration, along with

5

common law rights, in the chirp sound mark for mobile services (collectively, "the Chirp Mark"). Dkt.314-1; Dkt.314-19; Dkt.314-48; Dkt.298 at 196:14-197:6 (Shaughnessy); Dkt.298 at 127:10-21 (Wiley).

### 2.   *The Origin and Growth of the Nextel Brand*

The NEXTEL and Chirp Marks were first developed by Nextel Communications, Inc. in 1987. Dkt.298 at 109:13-14 (Wiley). Nextel Communications created the push-to-talk industry. Dkt.298 at 110:5-8 (Wiley). Other companies—including Sprint—followed suit. Dkt.298 at 180:14-25 (Shaughnessy). Nextel Communications used the NEXTEL and Chirp Marks to distinguish its products and services. Dkt.298 at 180:14-25 (Shaughnessy).

Nextel Communications invested heavily in its trademarks and in highly successful marketing campaigns that reached a broad audience. Dkt.298 at 181:12-24 (Shaughnessy). The Nextel Branding was promoted in commercials that aired to the general public across the United States, often using humor to make its brand memorable. Dkt.298 at 180:14-181:24 (Shaughnessy). The company ran a commercial prominently featuring both the NEXTEL and Chirp Marks during the Super Bowl—at the cost of tens of millions of dollars. Dkt.298 at 181:25-

184:21 (Shaughnessy); Dkt.314-17.  And it sponsored an entire NASCAR race series called the "Nextel Cup."  Dkt.298 at 187:8-13 (Shaughnessy).

       *3.*    *Sprint Acquires Nextel and Navigates Changes in the Mobile Services Industry*

Since its creation, the Nextel Branding has been a leading name in push-to-talk services.  The ownership and use of the Marks, however, has undergone several changes that provide important context here.

a.    In 2005, Sprint and Nextel Communications merged, forming a company known as "Sprint Nextel."  Dkt.298 at 178:23-179:4 (Shaughnessy).  Through that merger, Sprint acquired Nextel Communication's intellectual property, including the NEXTEL and Chirp Marks.  Dkt.298 at 186:23-187:2 (Shaughnessy).  Around 2013, Sprint Nextel changed its corporate name back to Sprint while being purchased by a company called SoftBank.  Dkt.298 at 179:17-24 (Shaughnessy).  Then, in 2020, Sprint merged with T-Mobile.  Dkt.298 at 176:17-21, 178:25-179:4 (Shaughnessy).

Meanwhile, in late 2007, as "economic conditions began to decline," the wireless industry began to suffer.  Dkt.318-10 at 99.  And to make matters worse, Sprint encountered significant, unexpected costs related to merging and maintaining two separate wireless networks in

connection with the 2005 merger with Nextel Communications. Dkt.322 at 16:1-18 (Shaughnessy); Dkt.318-10 at 48. In February 2008, Sprint wrote off, for tax and accounting purposes, the purchased goodwill of the merger—*i.e.*, the difference between the fair market value of the assets acquired in the transactions and the purchase price—on its financial statements. Dkt.318-10 at 99; Dkt.323 at 84:17-22 (Jobe).

Through each corporate transaction—and to the present day—Sprint has maintained its ownership and its registrations for the NEXTEL and Chirp Marks and has never lost or abandoned the goodwill, in the trademark sense, associated with those marks. Dkt.298 at 180:6-12, 193:5-196:16 (Shaughnessy); Dkt.323 at 84:17-22 (Jobe); Dkt.322 at 93:5-15 (Mancuso); Dkt.314-1; Dkt.314-47; Dkt.314-48.

b.    Sprint has also navigated changes in the telecommunications industry and evolving consumer needs. For example, originally, Sprint offered its Nextel push-to-talk services on its iDEN network. Dkt.298 at 69:13-18 (Kohman). By the late 2000s, however, consumers were using their cellphones in new ways (*e.g.*, email, text messages, social media apps) that the iDEN network could not support. Dkt.298 at 69:25-70:4, 71:22-25 (Kohman). To accommodate customer needs, Sprint first

migrated its Nextel push-to-talk services to its CDMA network. Dkt.298 at 70:5-12 (Kohman). And Sprint now uses the advanced Kodiak platform to provide its Nextel push-to-talk services. Dkt.298 at 78:6-79:2 (Kohman).

In addition, over time, Nextel push-to-talk devices and services have become more focused on particular classes of consumers—namely, public safety personnel, like first responders, and people working in logistics or government employment. Dkt.298 at 190:14-191:11 (Shaughnessy); Dkt.314-19; Dkt.298 at 110:13-17 (Wiley). Because these consumers sometimes work in dangerous conditions, Sprint began using the Nextel Branding to market certain "intrinsically safe" mobile devices—extremely rugged devices that meet high safety standards required, for instance, by a firefighter or gas driller. Dkt.298 at 72:1-19 (Kohman). And Sprint designed its Nextel push-to-talk services as priority services, allowing mission-critical users first use of the network. Dkt.298 at 68:1-2 (Kohman). Priority service allows a call to go through even in areas like stadiums or other big events where networks are congested. Dkt.298 at 67:22-68:4 (Kohman).

### *4.    Sprint's Continuous Use of the Nextel Brand*

Since acquiring the Marks in 2005, Sprint has continuously used the Nextel Branding to advertise and sell its push-to-talk products and services.    Dkt.298 at 106:6-13 (Kohman); Dkt.298 at 196:14-20 (Shaughnessy).    Sprint's recent marketing strategy reflects that its primary customer base for Nextel push-to-talk devices and services are businesses and government units, rather than individual consumers. Dkt.298 at 110:18-111:5 (Wiley).

Instead of mass-market Super Bowl commercials, Sprint now regularly uses the NEXTEL and Chirp Marks to market its push-to-talk services to business customers at trade shows, like the International Communications Wireless Expo ("IWCE") in 2017 and 2018.    Dkt.298 at 113:13-115:12,    115:20-117:12    (Wiley);    Dkt.298    at    191:12-192:9 (Shaughnessy); Dkt.314-6 at 8; Dkt.314-7; Dkt.314-11.    It employs them in sales materials used in on-site presentations to clients and potential customers.    Dkt.298 at 191:12-192:9.    And it uses them in presentations to clients at Sprint's briefing centers located throughout the country. Dkt.298 at 110:18-111:10 (Wiley).

10

The Marks also continue to be used in connection with push-to-talk mobile devices. The NEXTEL Mark appears on product packaging for those devices, often alongside marks of other companies connected with these devices, like the device manufacturer. Dkt.298 at 77:15-78:5, 133:19-134:6 (Wiley); Dkt.321 at 49:23-50:9 (Shaughnessy). Sprint has, for example, sold devices manufactured by Sonim—like the Sonim XP Strike IS rugged push-to-talk device—that featured the NEXTEL Mark on the product packaging. Dkt.321 at 29:6-19, 30:5-23 (Shaughnessy); Dkt.314-14; Dkt.323 at 88:18-23 (Jobe). It has also sold a series of Caterpillar—or CAT—rugged push-to-talk devices that were launched in 2021. Dkt.298 at 125:19-126:9 (Wiley). The CAT devices similarly display the NEXTEL Mark on the product packaging and use the Chirp Mark. Dkt.298 at 126:10-127:7 (Wiley). All of these devices are primarily sold business-to-business, but some are sold in Sprint retail stores. Dkt.298 at 197-98 (Shaughnessy).

The Nextel Branding continues to serve as "a differentiator" in the push-to-talk industry. Dkt.321 at 31:9-19 (Shaughnessy); Dkt.298 at 71:7-73:7 (Kohman). The NEXTEL Mark assures customers that Sprint's push-to-talk products and services are built on its gold-standard platform

11

and carry the reliability, quality, and value that consumers have long associated with the brand. Dkt.321 at 31:9-19 (Shaughnessy). The Chirp Mark gives users "comfort" that they are using Sprint's highly reliable platform. Dkt.298 at 196:6-13 (Shaughnessy).

## B.  The Defendants' Unlawful Use of the Nextel Branding

This case concerns Appellants' and their co-defendants' unlawful attempt to capitalize on goodwill that Sprint and its predecessors have earned with consumers of push-to-talk devices and services for their own financial gain.

### 1.  *Calabrese Launches a New Company Using NEXTEL*

In late 2016, Defendant Stephen Calabrese started a business to sell mobile devices and services under the Nextel name. Dkt.339-1 at 2; Dkt.323 at 20:8-15, 21:1-2 (Calabrese). Calabrese had some prior experience in telecommunications. Dkt.323 at 18:23-19:3 (Calabrese). With his new venture, he intended to move into the push-to-talk space, operating under the company name, Nextel Inc., doing business as Nextel Worldwide. Dkt.323 at 17:7-15, 31:9-13 (Calabrese).[2] Calabrese would later explain that he got the idea to use the Nextel name for his new

---

[2] Although Calabrese and his company are jointly and severally liable with Appellants, they are not parties to this appeal. Dkt.309; Dkt.353.

venture because he considered Nextel to be a famous and well-known brand.  Dkt.323 at 21:1-2 (Calabrese); Dkt.339-1 at 5.

When he was launching his infringing Nextel business, Calabrese believed it was "possible" that Sprint was still selling NEXTEL devices, and that those would "probabl[y]" be used with a network other than iDEN.  Dkt.339-1 at 5-6.  And, indeed, when he searched Google for the brand at the time, the first two results were a Wikipedia page for Nextel Communication, stating that the company continued to exist as a Sprint subsidiary, and a Sprint webpage offering push-to-talk phones and services under the Nextel brand.  Dkt.339-1 at 6-7; Dkt.314-13 at 1, 3. Calabrese nonetheless pushed forward with using the NEXTEL Mark for his new push-to-talk business.

> 2. *Calabrese's Use of NEXTEL Confuses Attendees of the 2017 IWCE Trade Show*

Calabrese and his company attended the IWCE trade show in 2017 and operated a booth under a large NEXTEL sign.  Dkt.342-1 at 57, 60-61, 75-76, 85-86 (Mancuso); Dkt.314-30; Dkt.314-31.  Wearing NEXTEL apparel, Calabrese and his associate manned the booth and engaged with the "many thousands" of people at the event.  Dkt.339-1 at 7.  Calabrese distributed NEXTEL-branded brochures that described the products and

services that he was offering under his NEXTEL business.  Dkt.342-1 at 57, 60-61, 75-76, 85-86 (Mancuso); Dkt.314-30; Dkt.314-31.   And the signage at the booth scrupulously copied the color scheme and stylization of Sprint's famous NEXTEL Mark.  Dkt.314-31 at 4.



*Calabrese's Brochure Branding (Dkt.314-26 at 7)*



*Sprint's Branding (Dkt.314-14 at 2)*

Numerous people asked Calabrese about his business's connection with the Nextel brand owned by Sprint.  Dkt.339-1 at 7.  And other attendees likewise observed confusion.   Brent Kohman, attending the IWCE show with his employer, Kodiak, was approached by multiple people confused about whether Calabrese was associated with Sprint. Dkt.298 at 74:24-75:15.  Scott Wiley and Tom Shaughnessy, both in

14

attendance for Sprint, were similarly approached by people confused about Calabrese's connection to Sprint.    Dkt.298 at 127:22-128:13 (Wiley); Dkt.321 at 63:18-65:2 (Shaughnessy).

Sprint's booth at IWCE 2017 also featured advertising with the NEXTEL Mark and the black and yellow color scheme.    Dkt.298 at 113:13-115:12 (Wiley); Dkt.314-6 at 8.    After seeing Calabrese's booth, Sprint discovered that Calabrese and Nextel Worldwide had a NEXTEL-branded website at nextelworldwide.com, and appeared to have commenced selling its counterfeit NEXTEL products to various third-party wireless dealers.    Dkt.342-1 at 57, 60-61, 75-76, 85-86 (Mancuso); Dkt.314-30; Dkt.314-31; Dkt.323 at 82:13-83:1 (Jobe).

### 3. Calabrese Assures Sprint He Has Stopped Infringing, While He and Kaplan Grow their Counterfeit Business

In April 2017, following the 2017 IWCE show, Sprint sent a cease-and-desist letter demanding that Calabrese and his company stop using the NEXTEL Mark, including at the domain name nextelworldwide.com. Dkt.314-33.    Sprint asserted its own superior rights in NEXTEL and documented Sprint's ownership of the NEXTEL Mark.    Dkt.314-33.

After negotiation, Calabrese agreed that he and his company would stop using NEXTEL completely.    Calabrese's attorney told Sprint on

15

October 26, 2017, that "pursuant to [Sprint's] recent demand, he has ceased using the mark on any products or services . . . and has ceased all offers for sale of telecommunications services and equipment using the Nextel mark." Dkt.314-37. Several months later, on February 8, 2018, Calabrese's attorney repeated those assurances, telling Sprint that Calabrese and his company had "stopped using the [NEXTEL] Mark" and "[t]his should allow [Sprint] to close [its] file on the matter." Dkt.314-37; *see* Dkt.339-1 at 9-10.

Those assurances were inaccurate. At the same time that Calabrese was telling Sprint that he had dropped his NEXTEL business, Calabrese was partnering up with Appellant Jeffrey Kaplan to expand it. Dkt.323 at 114:4-117:10 (Kaplan). Kaplan owned and operated Appellant Retrobrands USA LLC, a business dedicated to reviving "iconic" consumer brands. Dkt.292 at 57:23-58:16. Teaming up with Calabrese, Kaplan created a new business entity called Nextel Mobile Worldwide, Inc., to "revive" the iconic Nextel brand. Dkt.292 at 58:17-59:1.

Based on his previous experience in trying to acquire rights in established consumer brands, Kaplan knew that the law forbids

infringing on another's trademark. Dkt.298 at 17-20 (Kaplan); Dkt.323 at 117:17-20 (Kaplan). He also knew that Sprint had sent Calabrese a cease-and-desist letter and that Sprint had claimed to own valid and subsisting rights in the NEXTEL Mark. Dkt.323 at 114:4-117:10 (Kaplan); Dkt.321 at 69:21-23, 72:8-12. In conducting his own research in 2018, Kaplan also discovered that Sprint had renewed its rights in the NEXTEL Mark with the USPTO in 2015—two years after Sprint had shut down the iDEN network. Dkt.323 at 111:24-112:8, 114:4-23 (Kaplan); *see* Dkt.298 at 16:20-18:10 (Kaplan).

Nevertheless, on January 30, 2018, Kaplan and Calabrese entered, through their respective companies, into a Merchandising License Agreement concerning their intent to use the NEXTEL Mark. Dkt.314-39. The Agreement was admirably clear as to the parties' goals, stating explicitly that they intended to build a company around "the famous and iconic trademark NEXTEL," and then "to sell the company for tens of millions of dollars or possibly hundreds of millions of dollars within the next five years." Dkt.314-39 at 17. Under the Agreement, Retrobrands declared itself the owner of the NEXTEL Mark, and agreed to license this

17

Mark to Calabrese's company, which would continue to actively sell NEXTEL-branded goods and services. Dkt.314-39 at 3, 6.

Kaplan had applied the day before, in Retrobrands' name, to register NEXTEL with the USPTO in connection with telecommunication access services. Dkt.314-22. The USPTO promptly refused the application on the grounds that the applied-for mark was likely to cause confusion with Sprint's registered NEXTEL trademarks. Dkt.314-23. Undeterred, Kaplan applied a few months later to register the exact chirp sound mark owned by Sprint, even copying verbatim the description of the Chirp Mark directly from Sprint's own registration. Dkt.314-22; Dkt.314-24; *see* Dkt.298 at 24:3-25:20 (Kaplan). The USPTO refused that application, too, citing a likelihood of confusion with Sprint's Mark. Dkt.314-25.

> 4. *Kaplan and Calabrese Build their Unauthorized NEXTEL Business*

Through their partnership, Kaplan and Calabrese used the Nextel Branding to advertise and sell mobile devices and wireless services with push-to-talk capabilities to the same consumer segments that Sprint serves. Dkt.321 at 71:8-15; Dkt.314-20; Dkt.314-21; Dkt.314-26; Dkt.314-42; Dkt.298 at 151:15-152:8, 156:2-14 (Rabenold).

18

To be clear, Kaplan and Calabrese did not actually make mobile devices or own a wireless network.    Dkt.323 at 22:16-20, 24:6-9 (Calabrese).  They resold low-quality phones purchased from vendors in China who were instructed to affix NEXTEL stickers to the handsets. Dkt.323 at 25:14-18, 27:3-28:6 (Calabrese).  The example that they produced in litigation contained a battery that could not be charged up, meaning the phone could not be turned on.  Dkt.298 at 130:10-131:14 (Wiley); Dkt.314-44.  And their "services" consisted of buying SIM cards at Walmart or similar stores to insert into these devices, giving users access to wireless services being resold from some third party—not the advanced Kodiak platform on which Sprint relies.  Dkt.323 at 22:16-23:2, 23:24-24:13, 43:5-6 (Calabrese); Dkt.298 at 78:6-79:2 (Kohman).  Those third-party services thus lacked the critical feature that provides users (like first responders) with priority access to the network.  Dkt.298 at 67:16-68:4 (Kohman).

Kaplan and Calabrese nevertheless targeted consumers working as first responders and in industries like security, transportation, and hospitality—overlapping with Sprint's customers.  Dkt.321 at 72:3-7; Dkt.339-1 at 8; Dkt.298 at 36:24-37:1 (Kaplan); Dkt.314-20 at 1; Dkt.298

at 110:18-111:5 (Wiley). And their affiliates placed advertisements on social media promoting their products specifically to first responders. Dkt.298 at 36:19-37:24 (Kaplan); Dkt.314-35; Dkt.314-46.

In marketing their products and services, Kaplan and Calabrese consistently emphasized the NEXTEL Mark—even applying Sprint's black and yellow color scheme and the font treatment. *Compare* Dkt.314-14 at 2, *with* Dkt.314-20; Dkt.314-21; Dkt.314-30; *see* Dkt.298 at 156:2-14 (Rabenold); Dkt.314-42. And they used a sound mark virtually indistinguishable from—if not identical to—Sprint's Chirp Mark. *Compare* Dkt.314-1, *with* Dkt.314-38, *with* Dkt.314-45; *see* Dkt.298 at 153:2-154:20, 157:8-158:18 (Rabenold); Dkt.298 at 32:10-15, 33:24-34:1 (Kaplan); Dkt.314-20 at 23; Dkt.321 at 71:18-72:2.

Kaplan and Calabrese's marketing directly associated themselves with Sprint and the authentic NEXTEL brand. They told consumers: "Nextel is back," harkening to Nextel Communications Inc. and Sprint, and positioning themselves as the next iteration of this business. Dkt.314-38; Dkt.314-34 at 2. And Kaplan posted commercials that Sprint and its predecessor had aired to his website as if they were his own or

that he was permitted to use this content.  Dkt.298 at 34:8-20; Dkt.314-43; Dkt.314-17.

Kaplan and Calabrese used five NEXTEL-formative domains in connection with their counterfeit business: nextelworldwide.com, nextelmobileworldwide.com, nextelmobile.com, nextelisback.com, and getnextel.com.  Dkt.339-1 at 5; Dkt.298 at 31:15-19 (Kaplan); Dkt.298 at 158:19-159:18 (Rabenold).  Each domain resolved to webpages that use the NEXTEL and Chirp Marks to promote and sell push-to-talk goods and services, or to solicit investors to fund Appellants' business.  Dkt.298 at 32:10-21, 33:24-34:1 (Kaplan); Dkt.298 at 158:19-159:18 (Rabenold); Dkt.314-20; Dkt.314-21; Dkt.321 at 69:21-70:10, 71:18-72:2.

By the time of trial, Kaplan and Calabrese had sold hundreds of thousands of dollars' worth of products and services using the Nextel Branding.  Kaplan—who was due 10% of net revenue as his royalty under his licensing agreement with Calabrese—earned $40,000-$50,000 in royalty payments.  Dkt.323 at 108:6-16 (Kaplan); Dkt.314-39 at 4.  In March 2022 (a month prior to trial), Kaplan launched a website soliciting investors in his NEXTEL business, declaring that the Nextel brand he

claimed to own was conservatively worth at least $100 million.  Dkt.298 at 44:10-12 (Kaplan); Dkt.314-49.

## II.    Procedural History

Sprint initiated this action on April 11, 2018.  Dkt.1.  In the operative Amended Complaint, Sprint asserted claims against Calabrese, Kaplan, and their companies for infringement, unfair competition and false designation of origin, dilution, and counterfeiting of Sprint's NEXTEL and Chirp Marks, as well cybersquatting based on their use of NEXTEL in multiple internet domain names.  Dkt.80. During the jury trial in this matter, defendants argued that Sprint had abandoned its trademark rights in the Nextel Branding.

At the close of the defendants' case, the district court granted judgment as a matter of law to Sprint on the abandonment defense with regard to the Chirp Mark, finding no evidence supporting it, while reserving ruling on the NEXTEL Mark.  Dkt.324 at 22:8-29:14.[3]

The jury then returned a verdict for Sprint on all counts, finding:

- Sprint did not abandon the NEXTEL Mark;

---

[3] The district court further granted judgment to Sprint on several of Appellants' other counterclaims and defenses not at issue in this appeal. *See* Dkt.324 at 3:16-20:19.

- The defendants infringed, counterfeited, unfairly competed with, and were likely to dilute the famous NEXTEL Mark;
- The defendants committed cybersquatting on five separate domains with respect to the NEXTEL Mark; and
- The defendants have infringed, counterfeited, and unfairly competed with the Chirp Mark.

Dkt.309.

In addition, the jury found that Sprint had proven both statutory and disgorgement damages. The jury found that Sprint was entitled to $4,000,000 in statutory damages for its counterfeiting claims on the NEXTEL and Chirp Marks, and $500,000 in statutory damages for the cybersquatting claim. Dkt.309 at 2, 5, 7. It further found that Sprint was entitled to $400,000 in disgorgement on its infringement, unfair competition, and dilution claims. Dkt.309 at 3-4, 7.[4]

Immediately following the jury's verdict, Sprint orally requested that the district court permanently enjoin the defendants from engaging in further infringement, counterfeiting, and cybersquatting. Dkt.326 at 99:12-13. The court asked Sprint to file a written motion, indicating that the court would "sign it in a day or so." Dkt.326 at 99:16-17. After Sprint

---

[4] The verdict form could be read as finding $400,000 in disgorgement damages for each of these claims, but Sprint agreed in post-trial briefing that the jury likely intended—and the evidence supported—a collective disgorgement award of $400,000. *See* Dkt.335 at 4-5.

filed the motion as directed, the court issued the injunction and ordered defendants to transfer their five infringing domain names to Sprint and to abandon their applications to register NEXTEL and Chirp Marks with the USPTO.  Dkt.356.

In other post-trial briefing, Sprint acknowledged that it could not be awarded both statutory damages and actual damages, and requested statutory damages.  The district court agreed and entered a final money judgment for statutory damages in the amount of $4.5 million.  Dkt.352 at 4-5.  The court denied all other requests for post-trial relief.  Dkt.352, 385.

## III.  Standards of Review

This Court reviews a party's standing *de novo*, *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 975 (11th Cir.), *cert. denied*, 546 U.S. 872 (2005), asking whether each element of standing is "supported . . . with the manner and degree of evidence required at the [relevant] stage[] of the litigation." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1119 (11th Cir. 2022).  After trial, "the facts necessary to establish standing 'must be supported adequately by the evidence adduced at trial.'" *Jacobsen v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citation omitted).

The Court also reviews a ruling on a motion for judgment as a matter of law *de novo*, applying the same standard as the district court and "viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party." *Williams v. First Advantage LNS Screening Solutions, Inc.*, 947 F.3d 735, 744 (11th Cir. 2020) (citing *Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1347 n.5 (11th Cir. 2007)). Judgment as a matter of law is appropriate only when the movant "presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." *Christopher v. Florida*, 449 F.3d 1360, 1364 (11th Cir. 2006).

The Court reviews "the denial of a motion for a new trial only for an abuse of discretion." *Walter Int'l Prods., Inc. v. Salinas*, 650 F.3d 1402, 1407 (11th Cir. 2011). "Deference 'is particularly appropriate where a new trial is denied and the jury's verdict is left undisturbed.'" *Id.* (citation omitted). "An abuse of discretion occurs when a district court commits a clear error of judgment, fails to follow the proper legal standard or process for making a determination, or relies on clearly erroneous findings of fact." *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 846 F.3d 1159, 1163 (11th Cir. 2017).

The Court reviews monetary and injunctive relief awarded under the Lanham Act for an abuse of discretion. *Burger King Corp. v. Mason*, 855 F.2d 779, 781 (11th Cir. 1988) (per curiam) (damages); *U.S. Commodity Futures Trading Comm'n v. S. Trust Metals, Inc.*, 894 F.3d 1313, 1322 (11th Cir. 2018) (injunction). This standard "'allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment.'" *Broadcast Music, Inc. v. Evie's Tavern Ellenton, Inc.*, 772 F.3d 1254, 1257 (11th Cir. 2014) (quoting *In re Rasbury*, 24 F.3d 159, 168 (11th Cir. 1994)).

## SUMMARY OF ARGUMENT

The district court's judgment should be affirmed.

I.    Sprint had and has maintained Article III standing throughout the course of this litigation. *See Lujan v. Defs of Wildlife*, 504 U.S. 555, 560-61 (1992). Sprint produced indisputable evidence that it owned the trademarks at issue and that it suffered an injury-in-fact when Appellants infringed and counterfeited those Marks. The jury agreed. Based on that verdict, the district court entered a multimillion dollar damages award and a permanent injunction to prevent any further or future injury. Sprint's evidence at trial easily passes muster for

constitutional standing, and this Court should decline Appellants' attempt to litigate their merits arguments under the guise of jurisdiction.

II.A. Appellants provide no basis to disturb the rejection of Appellants' abandonment defense. Abandonment requires the complete cessation of trademark use without an intent to resume use, and Appellants failed to show that Sprint ever stopped using either Mark. Sprint's witnesses testified that Sprint continuously used the Nextel Branding at trade shows, in point-of-sale presentations, and on product packaging. In fact, Sprint marketed to many of the same consumer segments that Appellants targeted with their counterfeit goods and services. Sprint's use represents bona fide "use in commerce" under the Lanham Act sufficient to overcome any abandonment defense. 15 U.S.C. § 1127. Appellants' contrary arguments misconstrue the evidence at trial regarding the evolution of Sprint's corporate structure and marketing efforts.

B.    Sufficient evidence supports the jury's cybersquatting verdict. Appellants principally challenge that verdict on abandonment grounds— which fails for the reasons described above. And for similar reasons the

evidence also supports the jury's finding that Appellants lacked any good-faith belief that Sprint had abandoned the NEXTEL Mark.

C.    Sufficient evidence supports the jury's finding that the NEXTEL Mark was famous as required to support Sprint's dilution claim.    Indeed, the jury repeatedly heard Appellants and their codefendants admit that they chose to infringe the NEXTEL Mark precisely because of its fame and iconic status.    Trial testimony concerning Nextel's purported status as a "sub-brand" of T-Mobile reflects only that the Nextel brand now exists under T-Mobile as a matter of corporate structure, not in the minds of consumers.

III.    Sprint timely elected statutory damages "before final judgment [was] rendered by the trial court." 15 U.S.C. § 1117(d). Sprint requested statutory damages in its pleadings and before the jury, specifically providing evidence in support of its counterfeiting and cybersquatting claims under the Lanham Act. That Sprint ultimately chose statutory damages in lieu of disgorgement damages after the verdict is of no moment and is fully compliant with Section 1117(d). *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 347 n.5 (1998) (damages under the Copyright Act). Appellants enjoyed their right to a

28

jury trial on statutory damages, and the award is fully consistent with due process.

IV.    Appellants provide no sound basis to vacate the permanent injunction.  Appellants' jurisdictional challenge to the injunction rests on their implausible assertion that the district court implicitly denied injunctive relief when it entered judgment on the jury's verdict including boilerplate language dismissing all pending motions as moot.  But the court had already announced, in response to Sprint's oral request, that it intended to grant injunctive relief, and Sprint had not yet filed its written motion for a permanent injunction.  Because the court had not yet resolved Sprint's entitlement to injunctive relief, Appellants' premature notice of appeal had no effect on the court's jurisdiction.

The district court acted well within its discretion when it subsequently granted the injunction.  The jury's infringement finding created a presumption of irreparable harm that Appellants do not even approach overcoming.  This is particularly true considering the district court's finding that Appellants have continued their infringing conduct even after the jury's verdict.  *See* Dkt.385 at 10.  Appellants' cursory challenge to the remaining equitable factors is unpersuasive.

29

## ARGUMENT

Following a week-long trial, the jury rightly found Appellants liable on all counts of trademark infringement, counterfeiting, unfair competition, cybersquatting, and trademark dilution and awarded Sprint a multimillion-dollar verdict. The district court appropriately entered judgment awarding $4,500,000 in damages and enjoined Appellants from continuing to engage in their wrongful conduct. Appellants offer no persuasive reason to disturb that result. The final judgment should be affirmed.

## I.   Sprint Has Article III Standing to Pursue the Claims on Which the District Court Awarded $4.5 Million in Damages

For the first time on appeal, Appellants contend that Sprint lacks standing to pursue its claims on which the district court awarded $4.5 million dollars in damages and injunctive relief, because Sprint purportedly "has not and will not suffer an injury in fact." Opening Br. 21. Although courts must consider such jurisdictional questions even when belatedly raised, this one may be readily dismissed. Sprint produced overwhelming evidence at trial that Appellants' conduct injured them. Appellants' arguments confuse the standing analysis with the merits and are unpersuasive.

30

A party bringing a lawsuit must have and maintain Article III standing. *See Lujan*, 504 U.S. at 560-61. To have standing, a plaintiff must show (1) it has suffered "an injury in fact" that is both "concrete and particularized" and "actual or imminent"; (2) a "a causal connection between the injury and the conduct complained of"; and (3) a likelihood that "the injury will be redressed by a favorable decision." *Speech First, Inc.*, 32 F.4th at 1119 (quoting *Lujan*, 504 U.S. at 560-61). Each element of standing "must be support[ed] . . . with the manner and degree of evidence required at the successive stages of the litigation." *Id.* Because this case has proceeded to trial, "the facts necessary to establish standing 'must be supported adequately by the evidence adduced at trial.'" *Jacobsen*, 974 F.3d at 1245.

Sprint produced overwhelming evidence at trial demonstrating that Appellants infringed and counterfeited both Sprint's NEXTEL and Chirp Marks. *See, e.g.*, Dkt.314-1; Dkt.314-10; Dkt.314-14 at 2; Dkt.314-17; Dkt.314-20; Dkt.314-21; Dkt.314-22; Dkt.314-24; Dkt.314-26; Dkt.314-30; Dkt.314-31; Dkt.314-34 at 2; Dkt.314-38; Dkt.314-42; Dkt.314-43; Dkt.314-48; Dkt.298 at 191:12-192:9, 196:14-197:6 (Shaughnessy); Dkt.298 at 113:13-115:12, 115:20-117:12, 127:10-21 (Wiley); Dkt.323 at

31

88:18-23 (Jobe); Dkt.339-1 at 8; Dkt.298 at 24:1-25:20, 32:10-15, 33:24-34:1, 36:19-37 (Kaplan).   The jury expressly found that Appellants engaged in counterfeiting, infringement, unfair competition, dilution, and cybersquatting and awarded Sprint a multimillion-dollar damages award.   *See* Dkt.309.   On appeal, other than their abandonment arguments, Appellants do not even challenge the jury's findings of infringement, counterfeiting, or unfair competition.   And they concede that, if they do not prevail on abandonment, Sprint has proven at least $38,758 in compensatory damages.

That is more than sufficient to establish a cognizable injury under Article III.   *See Royal Palm Props., LLC v. Pink Palm Props., LLC*, 950 F.3d 776, 787 n.6 (11th Cir. 2020) (trademark infringement); *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019) (economic harm); *see also Carpenters Indep. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("A dollar of economic harm is still an injury-in-fact for standing purposes.").

Appellants contend (at 21-24) that Sprint lacks standing because it abandoned its Nextel Branding either before any wrongful conduct began or at least before Sprint transferred the Marks to T-Mobile, invalidating

that assignment. But those arguments conflate the merits of Sprint's claims with the Court's jurisdiction.

Standing is a threshold question "which must be addressed prior to *and independent of* the merits of a party's claims." *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) (citation omitted; emphasis added). As this Court and others have observed, courts "should avoid 'jurisdictionalizing' issues that are more properly characterized as . . . aspects of a party's merits case." *Id.* at 1063; *see SM Kids, LLC v. Google LLC*, 963 F.3d 206, 212 (2d Cir. 2020) ("We have cautioned against arguments that 'would essentially collapse the standing inquiry into the merits.'") (citation omitted); *Rideau v. Keller Indep. School Dist.*, 819 F.3d 155, 160 (5th Cir. 2016) (chiding defendant for "attempt[ing] to shoehorn all of its post-trial arguments into the doctrine of constitutional standing").

Both objections that Appellants raise to Sprint's standing—abandonment and invalid assignment—are merits issues, not jurisdictional ones. As the Second Circuit explained in *SM Kids*, the Lanham Act's trademark assignment provision, 15 U.S.C. § 1060, "do[es] not speak in jurisdictional terms" or provide any indication that Congress

33

intended it to create a jurisdictional requirement. 963 F.3d at 213. The same is true of the Act's trademark abandonment provision, 15 U.S.C. § 1127. In the absence of such language, the Supreme Court has emphasized that courts should treat such statutory requirements "as nonjurisdictional in character." *Id.* (citing *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006)); *cf. Ross*, 963 F.3d at 1063 (concluding that a party's alleged abandonment of property for a Fourth Amendment claim is a merits question, not jurisdictional).

None of the decisions on which Appellants rely support their contrary position. Most have nothing to do with standing and largely pre-date the Lanham Act—and thus the provisions at issue here.[5] The one case that does consider Article III standing, *Conversive, Inc. v. Conversagent, Inc.*, 433 F. Supp. 2d 1079 (C.D. Cal. 2006), found a trademark holder had standing even while it found there was no transferrable goodwill after an attempted trademark assignment. *See id.* at 1090, 1094.

---

[5] *See Nat'l Min. Co. v. Bourjois, Inc.*, 62 F.2d 1, 4 (7th Cir. 1932); *Lazar v. Cecilia Co.*, 30 F. Supp. 769, 771 (S.D.N.Y. 1939); *W.H. Childs & Son v. G. Sidenberg & Co.*, 11 F.2d 463 (D.C. Cir. 1926); *Mister Donut of Am., Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir. 1969).

Finally, it would be particularly inappropriate to permit Appellants to challenge Sprint's standing on the basis of its assignment of its trademark rights to T-Mobile. Unlike Appellants' arguments about abandonment, Appellants never challenged the validity of Sprint's assignment in the district court. Because the validity of a trademark assignment is not a jurisdictional issue, Appellants' failure to raise it below means it is forfeited here. *See Ramirez v. Sec'y, U.S. Dep't of Transp.*, 686 F.3d 1239, 1249-50 (11th Cir. 2012).

## II. Appellants Provide No Sound Basis to Vacate the Jury's Liability Findings

Appellants advance several challenges to the jury's liability findings. None has merit.

### A. Sprint Never Abandoned the NEXTEL and Chirp Marks

Appellants first contend that the district court erred in denying their renewed motion for judgment as a matter of law and motion for a new trial on Sprint's claims because, at some point, Sprint abandoned the NEXTEL and Chirp Marks.

35

1.    *Trademark Defendants Face a Heavy Burden to Prove Abandonment*

Abandonment is an affirmative defense to the claims at issue in this case, by which a defendant may try to evade liability by "demonstrat[ing] that a trademark plaintiff no longer holds the rights to a mark." *Cumulus Media, Inc. v. Clear Channel Comm'ns, Inc.*, 304 F.3d 1167, 1173 (11th Cir. 2002); *see Nguyen v. Biondo*, 508 F. App'x 932, 934-35 (11th Cir. 2013). An abandoned mark "falls into the public domain and is free for all to use" without offending trademark laws. *Cumulus Media*, 304 F.3d at 1173 (quoting J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 17:1 (4th ed. 2001)).

The Lanham Act imposes stringent burdens for a defendant to show abandonment. A trademark is considered abandoned only if "its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127. A trademark infringer thus faces a heavy, dual burden to escape liability: it must show both "[1] that the plaintiff has ceased using the mark in dispute, and [2] that he has done so with an intent not to resume its use." *Cumulus Media*, 304 F.3d at 1174. This burden is "stringent" and "strict" by design, "[b]ecause a finding of abandonment works [as] an involuntary forfeiture of rights." *Id.* at 1175.

36

On the first prong, "abandonment requires *complete* cessation or discontinuance of trademark use." *Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 938 (9th Cir. 2006). "Even a single instance of use is sufficient against a claim of abandonment of a mark if such use is made in good faith." *Id.* On the second prong, a defendant's "showing of three years of consecutive nonuse" creates a "rebuttable presumption of intent not to resume use." *Cumulus Media*, 304 F.3d at 1174 (citing 15 U.S.C. § 1127). But even if a defendant shows that the mark has not been used for a consecutive three-year period, a mark holder may rebut this presumption of intent by showing that "he either used the mark during the statutory period or intended to resume use." *Id.* at 1177. And the "ultimate burden of persuasion" remains with the defendant at each element. *Id.*

> 2. *The Evidence Demonstrates Sprint's Continuous Use of the NEXTEL and Chirp Marks*

In this case, the Court need go no further than the first prong of Appellants' abandonment defense: Appellants provided no evidence that Sprint stopped using either the NEXTEL or Chirp Marks. Appellants claim that "over the course of more than 14 years, Sprint methodically, deliberately, and publicly shut down Nextel and ceased all use of

37

NEXTEL marks." Opening Br. 26. More specifically, they claim that "Sprint presented no evidence of use between 2013 and 2021—8 years." *Id.* at 29 (emphasis omitted). Setting aside Appellants' wayward attempt to flip the burden of proof to Sprint, they are simply wrong about the record.

The evidence presented to the jury amply demonstrated Sprint's continuous use of the Nextel Branding from its acquisition to the present day. Brent Kohman, who worked at Sprint as a manager of business base retention until 2014, testified how, contrary to Appellants' assertions, Sprint continued offering its Nextel push-to-talk services even after decommissioning the iDEN network, offering the services first on its CDMA network and now on the Kodiak platform. Dkt.298 at 67:1-68:11, 69:13-18, 70:5-12, 78:6-79:2. As Kohman explained, Sprint continued using the Nextel Branding because the Marks still "had value." Dkt.298 at 74:12-13.

Kohman also testified that just two years before Sprint migrated its Nextel push-to-talk services to the CDMA network, Sprint had turned down two multimillion-dollar offers to buy the NEXTEL Mark because Sprint was "still using the brand" and wanted to maintain this valuable

38

asset.  Dkt.298 at 73:13-74:13.  And he testified that even after he began working for Kodiak and then Motorola, he observed Sprint using the Nextel Branding at trade events and during business presentations (now in the role of one of Sprint's business-to-business customers).  Dkt.298 at 73:8-75:1.

Scott Wiley, a product development manager at Sprint (and now T-Mobile) for more than a decade, provided similar testimony.  Dkt.298 at 107:24-108:11.  Wiley described Sprint's use of the Nextel Branding to sell its push-to-talk devices and services at trade shows in 2017, 2018, and 2019, as well as in business-to-business customer meetings throughout his time at the company.  Dkt.298 at 110:5-111:1.  Wiley explained how he personally attended these trade shows and presented at customer meetings where push-to-talk devices and services were marketed and sold under the Nextel Branding.  Dkt.298 at 111:2-112:15, 119:9-123:24.  And he identified two of Sprint's CAT devices that T-Mobile has marketed and sold using the Nextel Branding since 2021.  Dkt.298 at 125:19-127:8, 132:17-21; Dkt.314-40; Dkt.314-41.

Tom Shaughnessy, Director of Marketing at T-Mobile and Sprint, testified about the Sonim XP Strike IS that Sprint also marketed and

sold under the Nextel Branding.  Dkt.321 at 29:15-31:19; Dkt.314-10.  He explained that the device was introduced in 2013 and was sold continuously until 2018 or 2019, generating several million in revenue for Sprint annually.  Dkt.321 at 30:5-8, 35:9-36:2.  And he testified that Sprint has used the NEXTEL and Chirp Marks for other devices since 2013, such as devices manufactured by Kyocera.  Dkt.321 at 36:7-14.  In fact, Shaughnessy told the jury that Sprint has continually used the NEXTEL and Chirp Marks across multiple devices with no gaps in use. Dkt.321 at 29-36.

Finally, underscoring all of this testimony, Sprint also introduced marketing materials used at trade shows in 2017, 2018, and 2019 that employed the NEXTEL Mark to signify products and services backed by Sprint's experience, expertise, and proven track record in the push-to-talk sector.  Dkt.314-6; Dkt.314-7; Dkt.314-8; Dkt.314-11.  And Sprint showed the jury an example of the point-of-sale presentation used in customer meetings, like those Wiley and Kohman attended, using both the NEXTEL and Chirp Marks to sell Sprint's push-to-talk offerings. Dkt.314-5; Dkt.314-14.

In sum, the jury: (1) heard testimony from multiple Sprint witnesses and a third-party witness describing Sprint's continuing use of the NEXTEL and Chirp Marks from 2013 through the present, (2) was shown multiple examples of push-to-talk devices Sprint sold between 2013 and 2021 under the NEXTEL Mark and that used the Chirp Mark, and (3) was shown marketing and promotional materials Sprint produced to sell these (and other) devices using the NEXTEL and Chirp Marks. In light of that evidence of continuous use, the district court correctly refused to grant Appellants judgment as a matter of law or a new trial on abandonment.

### 3. *Appellants' Abandonment Arguments Lack Merit*

Appellants' arguments misconstrue the record and, ultimately, cannot explain away the evidence of Sprint's continuous use.

a.    Sprint never "announce[d] to the general public that these Marks were not to be used in the future." Opening Br. 26-27. Appellants wrongly equate Sprint's decommissioning of the iDEN network with discontinuing the Nextel Branding. *Id.* To be sure, the iDEN network was sometimes referred to as "the Nextel network," among other nicknames. *See* Dkt.321 at 62:8-14 (Shaughnessy). But it is not, and

never was, coextensive with the products and services offered under the Nextel Branding. *See* Dkt.321 at 65 (Shaughnessy); Dkt.298 at 71:7-17 (Kohman).

Sprint's rights in the NEXTEL and Chirp Marks arise from its use of the Marks in connections with all of its devices and services, not a particular cellular network supporting them. And Sprint continued to use the Nextel Branding well after the 2013 decommissioning of the iDEN network. That continued use squarely distinguishes the sole case on which Appellants rely for this argument. *See Hiland Potato Chip Co. v. Culbro Snack Foods, Inc.*, 720 F.2d 981, 983-84 (8th Cir. 1983) (finding abandonment where trademark holder made a "public declaration of discontinuance of [the] trademark" and did not sell any products under the mark).

b.   Sprint also never disavowed the substantial goodwill that it and its predecessors built in connection with the iconic Nextel Branding. *Cf.* Opening Br. 27. Here, Appellants conflate Sprint's 2008 decision to write off for tax and accounting purposes the purchased goodwill from the 2005 Sprint-Nextel merger with a decision to disavow the trademark goodwill in the Nextel Branding.

42

Goodwill, in the trademark sense, is the expectation that customers will continue to buy trademarked goods and services.  *See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 2:17 (5th ed. 2023).  It encompasses both "the likelihood that customers will return to the old place of business" and the likelihood "'that they will continue to do business with the old name.'"  *Id.* (citation omitted).  Purchased goodwill, in the accounting sense, "is the residual value that is calculated by subtracting the fair market value of all the tangible assets and identified intangible assets from the total acquisition purchase price."  R. Reilly, *SFAS Nos. 141 and 142 Implications for Goodwill Acquired by M&A*, Am. Bankruptcy Institute J. 48 (Feb. 2006).  Purchased goodwill can be "written off" a company's balance sheet if it becomes clear that "the fair value of the company equity . . . exceeds the recorded amount of the company's equity."  *Id.*

In 2008, Sprint wrote off the purchased goodwill from its merger with Nextel Communications Inc. for tax and accounting purposes, principally due to unexpected costs in managing two distinct cellular networks.  Dkt.322 at 16:1-18 (Shaughnessy); Dkt.318-10 at 48, 99.  But it never wrote off "the goodwill of the NEXTEL trademarks that [it]

43

continue[s] to use and maintain." Dkt.323 at 84:19-22 (Jobe). Its accounting measure certainly does not suggest it was relinquishing all rights in the Nextel Branding. Appellants implicitly acknowledge this by repeatedly arguing that it was not until 2013 that Sprint abandoned the Nextel Branding—five years after Sprint implemented the goodwill write-down in response to an economic downturn. Dkt.323 at 84:14-22 (Jobe).

c. The changes in Sprint's use of the Nextel Branding through its mergers and its transition to focus on first responders and other enterprise customers do not show a "complete cessation or discontinuance of trademark use." *Electro Source*, 458 F.3d at 938. Quite to the contrary. Sprint and its predecessor spent years building Nextel as the most trusted brand in push-to-talk services. Through all of the mergers and evolution of the mobile services market, the company has made a conscious decision to maintain the goodwill, reputation, and brand loyalty it had built in the Nextel brand to great success.

d. Finally, Appellants err in contending that Sprint's continuing use of the NEXTEL and Chirp Marks does not qualify as "use in commerce" for trademark purposes. *See* Opening Br. 28-32. Under the

Lanham Act, a "use in commerce" is any "bona fide use of a mark in the ordinary course of trade, and not merely made to reserve a right in a mark." 15 U.S.C. § 1127. Bona fide uses in connection with goods include placing a mark "*in any manner* on the goods *or* their containers *or* the displays associated therewith *or* on the tags or labels affixed thereto." *Id.* (emphases added). In connection with services, bona fide uses include "us[ing] or display[ing]" a mark "in the sale or advertising of services." *Id.* That is precisely what Sprint did when it used the Nextel Branding to market push-to-talk devices and services continuously at trade shows, in business-to-business sales pitches, and on the packaging of the rugged, intrinsically-safe devices it sold.

It makes no difference that Sprint's use of the NEXTEL and Chirp Marks were often used in connection with devices that were *also* marketed and sold using different trademarks. *See McCarthy on Trademarks*, *supra* § 7:8 ("A single product may be 'co-branded' and have multiple marks owned by different firms to indicate their respective goods or services that are incorporated into the sale of the final product."); *e.g.*, *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1267 (5th Cir. 1975)

45

(recognizing that a bona fide use may include goods "identified by more than one trademark").

Although Appellants insist that Sprint engaged in only "token" uses of the Marks, the evidence at trial showed differently. Unlike in *Specht v. Google, Inc.*, 747 F.3d 929 (7th Cir. 2014), that evidence showed that Sprint's use of the NEXTEL and Chirp Marks was not "isolated" or "sporadic" but continuous and far more extensive than a single website or mass mailing disconnected from the sale of any goods or services. Indeed, Sprint earned millions in revenue annually from selling NEXTEL-branded devices and services, and the Nextel Branding has always been an important asset. Dkt.298 at 186-96 (Shaughnessy); Dkt.321 at 29-31, 35-36.

And unlike in *American Photographic Publishing Co. v. Ziff-Davis Publishing Co.*, 135 F.2d 569 (7th Cir. 1943), Sprint never announced nor had any intention to discontinue using the Nextel Branding. *See* pp. 42-43, *supra*. Sprint's use was no mere "epitaph[] on the tombstones in the family burial plot," reflecting "an honored past." Opening Br. 32 (quoting *Am. Photographic*, 135 F.2d at 572). Rather, Sprint's witnesses testified that, during the entire period of this suit, Sprint actively employed the

46

longstanding and iconic gold-standard Nextel Branding to sell its push-to-talk devices and services. *See* pp. 38-41, *supra*.[6] The jury credited that evidence, and Appellants provide no persuasive reason for this Court to disturb its verdict.

### B.    The Evidence Supports the Cybersquatting Verdict

Appellants briefly argue (at 33) that insufficient evidence supports the jury's cybersquatting verdict.    In that count, the jury found Appellants liable for registering, and using in bad faith, internet domain names that were identical or confusing similar to the NEXTEL Mark. Dkt.309 at 4-5; *see* 15 U.S.C. § 1125(d)(1)(A).    On appeal, Appellants principally argue that the cybersquatting claim fails for the same reason as Sprint's other Lanham Act claims, namely Sprint's purported abandonment of the Mark.    That argument fails for all the reasons described above.

---

[6] Contrary to Appellants' suggestion (at 32), Brian Mancuso, a former Sprint employee, did not testify that Sprint used the NEXTEL Mark only as a historical reference.  Mancuso recognized that the Sonim XP Strike was "currently . . . branded Nextel" and that Sprint has continued using that brand on both devices and with wireless services. *See* Dkt.322 at 86, 93.

Appellants further suggest, however, that they lacked a bad-faith intent to profit from the NEXTEL Mark because they "believed and had reasonable grounds to believe" that Sprint had abandoned it. *See* Opening Br. 33 (quoting 15 U.S.C. § 1125(d)(1)(B)(ii)). But the jury also had ample basis to reject that excuse. Appellants were on notice from the start of their unlawful scheme that the NEXTEL Mark had not been abandoned. When Calabrese performed a Google search on Nextel, before launching his new venture, the first two results affirmed that the company was still a subsidiary of Sprint that offered push-to-talk phones and services. Dkt.339-1 at 6-7; Dkt.314-13. Soon after Calabrese began using the Mark, Sprint sent a cease-and-desist letter explaining its continued use—in response to which Calabrese twice falsely assured Sprint that he had stopped using the Mark. Dkt.314-33; Dkt.314-37; Dkt.339-1 at 9-10. And the USPTO subsequently rejected Kaplan's attempt to register the Mark because Sprint's NEXTEL Mark was still valid. Dkt.298 at 24:1-25:20 (Kaplan); Dkt.314-22; Dkt.314-23; Dkt.314-24; Dkt.314-25. That evidence provided the jury more than a sufficient basis to reject Appellants' claim that they "reasonably believed their use

48

of Nextel in the domain names" for their own counterfeit products "was fair and lawful."  Opening Br. 33.

## C.    The Evidence Supports the Dilution Verdict

Appellants challenge the jury's dilution verdict on the ground that Sprint did not provide sufficient evidence of the NEXTEL Mark's fame. Trademark dilution imposes liability for blurring or tarnishing a famous mark.  15 U.S.C. § 1125(c).  A mark "is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  *Id.* § 1125(c)(2)(A). The Lanham Act provides a nonexclusive list of relevant factors, including the scope and extent of advertising, the volume and geographic scope of sales, the extent of actual recognition of a mark, and whether a mark is registered.  *Id.*  Fame is a factual finding.  *See Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 155-56 & n.5 (4th Cir. 2014); *Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 536 (5th Cir. 2012).  And Appellants fail to show that the jury's finding that the NEXTEL Mark is famous is unsupported by the evidence.

1.    Appellants' arguments here are surprising given their concessions that the NEXTEL Mark is famous and iconic.

49

Both Kaplan and Calabrese testified repeatedly about the NEXTEL Mark's fame.  Kaplan conceded the Mark is famous, acknowledging that "Nextel and Sprint spent hundreds of millions of dollars to make it famous and iconic."  Dkt.298 at 28:12-23.  And Calabrese similarly agreed that the brand is "famous" because it is "well known."  Dkt.323 at 35:6-9.

Indeed, the defendants targeted the NEXTEL Mark precisely because it is famous.  In the licensing agreement between them, they touted their "goal" "to build a communications company based on the re-launch and re-branding of the *famous and iconic* trademark Nextel."  Dkt.314-39 (emphasis added).  And Appellants proudly proclaimed that, through their efforts, the "Iconic NEXTEL Communications Brand has been Relaunched Across America."  Dkt.314-27.  Appellants' entire business model is to "revive" purportedly abandoned "consumer iconic brands and to bring them back to the marketplace."  Dkt.314-27.

This evidence alone provides sufficient evidentiary support for the jury's finding that the NEXTEL Mark is famous.  *See MasterCard Int'l Inc. v. Trehan*, 629 F. Supp. 2d 824, 830 (N.D. Ill. 2009) (crediting defendant's concession that trademark was "famous" given plaintiff's "long use and extensive efforts to promote its brand").

50

In any event, Appellants' concessions that the NEXTEL Mark is famous are fully supported by the evidence Sprint advanced at trial. Shaughnessy, Sprint's marketing director, detailed Sprint's extensive marketing strategy for the Nextel brand that included a multimillion-dollar Superbowl commercial, lucrative sponsorships with brands such as NASCAR, and sophisticated television advertising. Dkt.298 at 184-90. Numerous witnesses also testified to the widespread marketing efforts the company engaged in to promote the Nextel brand and to maintain its name recognition. *See* Dkt.298 at 191-92 (Shaughnessy); Dkt.298 at 110-17 (Wiley); Dkt.298 at 106 (Kohman). And Shaughnessy confirmed that the Nextel brand continued to "resonat[e]" with the public, was "familiar[]," and known to be "reliabl[e]." Dkt.298 at 179:8-16 (Shaughnessy).

Courts have affirmed factual findings of fame based on similar evidence—even in the absence of a defendant's concession. *See, e.g.*, *Audi AG v. D'Amato*, 469 F.3d 534, 547 (6th Cir. 2006) (affirming that Audi's trademarks "on which Audi has spent millions of dollars and which are known worldwide" were famous); *adidas Am., Inc. v. Sketchers USA, Inc.*, 890 F.3d 747, 758-59 (9th Cir. 2018) (affirming district court's finding

that a mark was famous based on "substantial evidence" of "a high degree of recognition" among consumers); *Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 391 (S.D.N.Y. 2008) (finding mark famous where mark owner's "evidence demonstrate[d] the distinctive quality and great degree of recognition enjoyed by the . . . mark").[7]

2.    Appellants contend (at 36) that Sprint failed to show that the NEXTEL brand achieved anything but "niche" fame.  They principally rely on a comment by Wiley that NEXTEL was "a sub-brand" for push-to-talk devices and services.  *Id.*[8]  But Wiley identified NEXTEL only as a sub-brand of parent company *T-Mobile*, not as a niche brand within the push-to-talk industry.  Dkt.298 at 135:4-7.  No principle of trademark law

---

[7] While the Lanham Act sets out the proper standard for fame, Appellants rely heavily (at 35-36) on two out-of-circuit decisions that declined to consider the statutory factors and imposed a heightened "household name" standard for dilution fame.  *See Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 963 F.3d 859, 871 (9th Cir. 2020); *Thane Int'l v. Trek Bicycle Corp.*, 305 F.3d 894 (9th Cir. 2002).  The evidence was sufficient to meet even that standard, but as the Northern District of Georgia has recognized, this Court has not adopted that approach.  *See Herman Miller, Inc. v. Belnick LLC*, 510 F. Supp. 3d 1342, 1348 (N.D. Ga. 2021) (affirming a jury finding of fame for another Herman Miller brand under the statutory factors).

[8] Appellants also quote Wiley as describing NEXTEL as "a niche brand on push-to-talk devices."  Opening Br. 36.  But that label actually comes from a question that Appellants' counsel posed to Wiley. *See* Dkt.298 at 8-10 ("Q. So it's a niche brand on push-to-talk devices?").

precludes the brand of a corporate subsidiary—like Disney's ESPN, Alphabet's Google, or Meta's Facebook—from achieving fame for dilution purposes.

The rest of Appellants' purported evidence of niche fame is similarly insufficient. Shaughnessy's description of NEXTEL as a "sub-brand" within Sprint after the Sprint-NEXTEL merger similarly did not suggest that NEXTEL has ever been a niche brand in the push-to-talk industry. Dkt.322 at 8:19-9:18. And while Kohman agreed that the push-to-talk segment of the cellphone industry "was a smaller part of the market geared towards business generally," and particularly to firefighters, Dkt.298 at 86:6-12, the relevant question is the amount of consumer *recognition*, not the relative size of the customer base. Consumers can widely recognize a mark, like Louis Vuitton, Chanel, or Bentley, even if they are not part of the target market. *See Malletier*, 561 F. Supp. 2d at 391; *Chanel, Inc. v. Makarczyk*, 110 U.S.P.Q. 2d 2013 (T.T.A.B. 2014); *Bentley Motors Ltd. v. McEntegart*, 976 F. Supp. 2d 1297, 1313 (M.D. Fla. 2013).

3.    Finally, even if this Court agreed with Appellants' challenge to the jury's finding of fame, neither the monetary nor injunctive relief

the jury and district court awarded Sprint would substantively change. The statutory damages award rests exclusively on the jury's counterfeiting and cybersquatting claims—to which fame is irrelevant. And even without the jury's dilution verdict, Appellants are appropriately enjoined from "ongoing or future acts of trademark infringement, counterfeiting, unfair competition . . . , or cybersquatting." Dkt.356 at 2.

## III. Appellants Provide No Sound Basis to Vacate the Damages Award

Appellants' challenges to the damages award also lack merit.

### A. Sprint Timely Elected Statutory Damages

Sprint timely requested and elected statutory damages. Under the Lanham Act, a plaintiff may seek statutory damages for trademark infringement "at any time before final judgment is rendered by the trial court." 15 U.S.C. § 1117(d). To "elect" statutory damages requires a plaintiff "simply to choose" such damages and "inform the court—either orally or in writing—of his intent to seek them at any point before final judgment." *Smith v. Thomas*, 911 F.3d 378, 382 (6th Cir. 2018) (construing identical language in Copyright Act about election of

damages).[9]  The requirement "is a permissive provision, not a procedural hurdle" designed to stymie a plaintiff in seeking his award.  *Id.*  "And the election does not have to exclude the possibility of actual damages—plaintiffs are entitled to simultaneously seek actual damages and statutory damages in the alternative."  *Id.*

Sprint plainly satisfied this permissive requirement.  Sprint included a request for statutory damages in its pleadings for its counterfeiting and cybersquatting claims.  Dkt.80.  Before the jury, it presented evidence supporting its requests for both statutory and disgorgement damages.  After the jury returned its verdict in favor of Sprint on each request, Sprint chose the jury's statutory damages award in lieu of a disgorgement award.  That approach is fully compliant with Section 1117(d) and, in fact, has been approved (in the context of the Copyright Act) by the Supreme Court.  *See Feltner*, 523 U.S. at 347 n.5 (allowing a plaintiff to receive a jury verdict containing both actual and statutory damages, and then elect which to recover).

---

[9] Appellants agree that the Lanham Act "tracks the language of the Copyright Act" and "[c]ourts often look for guidance to the better developed case law under the Copyright Act."  Opening Br. 37 n.2.

Despite Section 1117(d)'s text, Appellants argue that to protect a defendant's right to a jury trial, a "plaintiff's last opportunity to elect statutory damages is when the case is submitted to the jury for deliberation." Opening Br. 38. But Sprint made abundantly clear its intent to seek statutory damages before the case was submitted to the jury (in its complaint and in its presentation to the jury), and the jury found Sprint to be entitled to receive them. Appellants thus enjoyed any right to a jury trial on statutory damages and received all the notice and opportunity to be heard on that issue that due process requires.

In arguing to the contrary, Appellants conflate (at 38-39) the need to submit to the jury the question of statutory damages and the eventual requirement to choose whether it wishes to actually receive an award of statutory or other damages. Due process requires notice and an opportunity to be heard, not an advance election of remedies. *See Feltner*, 523 U.S. at 347 n.5 (explaining that the statutory "election may occur even after a jury has returned a verdict on liability"); *Olem Shoe Corp. v. Wash. Shoe Corp.*, 591 F. App'x 873, 878 n.5 (11th Cir. 2015) (same).

Finally, Appellants curiously argue that a plaintiff may not elect statutory damages for the first time on appeal. Opening Br. 38-39 (citing

56

*Jordan v. Time, Inc.*, 111 F.3d 102, 104 (11th Cir. 1997)).    That proposition has no relevance here.  Sprint requested statutory damages from the very outset of this case, and it chose between the jury's statutory damages award and disgorgement award before the district court entered final judgment and before any appeal.  Section 1117(d) requires nothing more.  Because the district court did not abuse its discretion, Sprint's statutory damages award of $4,500,000 should be affirmed.

### B.    The Evidence Supports the Jury's Damages Finding that Appellants Earned $400,000 in Profits

Because Sprint properly elected statutory damages, the Court need not reach Appellants' challenge to the jury's disgorgement finding.  But in any event, that challenge also fails.  Damages under the Lanham Act may include "(1) [the] defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).  In calculating a defendant's profits, "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."  *Id.*  On appeal, a "district court's damage assessment is entitled to deference."  *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1564 (11th Cir. 1986).  It "will not be set aside unless the

award is clearly inadequate," particularly for "an award fashioned pursuant to the Lanham Act." *Id.* at 1564-65.

The basis for the jury's determination of the defendants' profits is straightforward. Kaplan testified, and the licensing agreement between Kaplan and Calabrese confirmed, that (1) Kaplan received $40,000-50,000 in royalty payments on NEXTEL-branded goods and services and (2) his royalty rate was 10% of the total net revenue. Dkt.323 at 108:13-25; Dkt.314-39. That evidence amply demonstrated gross revenues on sales of infringing products between $400,000 and $500,000—*i.e.*, Kaplan's royalty payments divided by his royalty rate. At that point, the burden shifted to Appellants to prove any deductions or expenses. But Appellants provided no such evidence. The jury thus reasonably found that the defendants' profits from infringement equaled $400,000.

Appellants complain at length that Sprint did not prove $400,000 in damages to *Sprint* or profits that *Sprint* lost as a consequence of the defendant's unlawful conduct. *See* Opening Br. 40-42. But Appellants confuse different types of damages available under Section 1117(a). Sprint did not seek, and the jury did not award, *Sprint's* lost profits—*i.e.*, compensation based on "damages sustained by the plaintiff." 15 U.S.C.

58

§ 1117(a). Sprint requested, as an alternative to statutory damages, only disgorgement damages—*i.e.*, the *defendants'* profits from infringement. Appellants eventually concede that the Lanham Act authorized Sprint to do so. *See* Opening Br. 42. And, thus, the entire discussion of lost profits and actual damages can be disregarded.

With respect to Appellants' own profits, they argue that the award must be "constrained to . . . the amount proved." Opening Br. 42 (quoting *Thompson v. Haynes*, 305 F.3d 1369, 1380 (Fed. Cir. 2002)). Fair enough. But, again, it is proof of *defendants'* profits that constrains, not proof of the plaintiffs'. And as explained, Sprint provided sufficient proof of at least $400,000 in the defendants' profits under the burden-shifting framework established by the Lanham Act. Appellants simply failed to prove any costs or deductions.

### C. The Statutory Damages Award Does Not Violate Due Process

Lastly, the damages award does not violate due process. Appellants argue (at 43) that the statutory damages award is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66-67 (1919). But given Congress's authorization of the damages awarded,

this Court's review of such a due process claim "is extraordinarily deferential—even more so than in cases applying abuse-of-discretion review." *Zomba Enterprises, Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 587 (6th Cir. 2007). Appellants' challenge falls short.

Appellants' argument principally rests on their meritless argument for abandonment and their misguided attack on the jury's compensatory award. *See* Opening Br. 44. Because those arguments both fail, Appellants' due process argument should be rejected as well. Courts regularly countenance statutory damages awarded well in excess of the 10:1 ratio between the statutory damages award of $4.5 million and the jury's well-supported finding of $400,000 in non-statutory compensatory damages. *See, e.g., Zomba*, 491 F.3d at 588 (44:1); *Sony BMG Music Ent. v. Tenenbaum*, 719 F.3d 67, 71 (1st Cir. 2013) (1,500:1); *Pasco v. Protus IP Sols., Inc.*, 826 F. Supp. 2d 825, 834 (D. Md. 2011) (rejecting argument that ratio that exceeds single-digits between statutory and actual damages violate due process).

But even if $38,000 in actual damages provided the correct basis for judging whether the statutory damages award is so "severe and oppressive" as to violate due process, the argument fails. In *Williams*

60

itself, the Court rejected a due process challenge to a statutory damages award that equaled almost the exact same 113:1 ratio. 251 U.S. at 66-67; *see Sony BMG Music Ent.*, 719 F.3d at 71 (1,500:1); *Virtual Studios, Inc. v. Beaulieu Grp., LLC*, 987 F. Supp. 2d 769, 777 (E.D. Tenn. 2013) (200:1); *Centerline Equip. Corp. v. Banner Personnel Serv., Inc.*, 545 F. Supp. 2d 768, 777 (N.D. Ill. 2008) (up to 30,000:1).

The statutory damages award is all the more reasonable in light of the jury's unchallenged finding of willfulness and its well-supported finding of bad faith. *See* Dkt.309 at 2. Congress provided for statutory damages to deter trademark violations "where actual harm is difficult or impossible to calculate." *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899, 907-08 (8th Cir. 2012); *Sony BMG Music Ent.,* 719 F.3d at 72. The district court did not abuse its substantial deference in determining the appropriate damages award to serve those purposes.

## IV. The District Court Did Not Abuse Its Discretion Granting Injunctive Relief Against Further Infringement

Finally, Appellants' attacks on the injunctive relief the district court granted against their continuing (and persisting) infringement of Sprint's Marks are also unavailing.

61

**A.    The District Court Retained Jurisdiction to Grant the Permanent Injunction**

Appellants' argument (at 45-47) that the district court lacked jurisdiction to enter the permanent injunction rests on an implausible understanding of the district court's orders that the district court has expressly rejected.    Appellants claim that, when the district court initially entered judgment on the jury's award of money damages and denied "all pending motions as moot," Dkt.310 ¶ 6, the court "implicitly den[ied] any [motion for a] permanent injunction," Opening Br. 45.  But as the district court explained, its language denying all pending motions was boilerplate language included as part of its "standard practice at the conclusion of a jury trial." Dkt.385 at 14.  It was not intended, implicitly or explicitly, to resolve Sprint's preliminary injunction request.  Indeed, at the time the court entered judgment, Sprint had not yet *filed* its written motion for a permanent injunction.  Dkt.385 at 14.

Appellants implausibly insist (at 45) that, contrary to the district court's own understanding, the court must have meant to deny Sprint's previous oral request for a permanent injunction.  But the court had already responded to Sprint's oral request by instructing it to file a written motion for a permanent injunction and indicating the court's

62

intention *to grant it*. *See* Dkt.326 at 99:16-17 ("And as for your injunction, file something and I'll sign it in a day or so."). The boilerplate language in the subsequent judgment could not reasonably be understood to reverse that instruction and unwittingly *deny* any permanent injunction request. Indeed, the district court itself expressly rejected Appellants' implausible interpretation of that language. Dkt.385 at 13-14.

Because the district court did not prematurely—and mistakenly—deny Sprint's request for a permanent injunction, Appellants' premature notice of appeal did not divest that court of jurisdiction. Section 1291 grants this Court appellate jurisdiction over "final decisions" of a district court. 28 U.S.C. § 1291. Judgments issued when "other relief remains to be resolved have never been considered to be 'final' within the meaning of 28 U.S.C. § 1291." *Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 744 (1976); *see, e.g.*, *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1541-42 (10th Cir. 1996). And "a notice of appeal that is defective because it is premature cannot transfer jurisdiction to the circuit court." 20 Moore's Federal Practice – Civil § 303.32 (2022) (citing *General Television Arts, Inc. v. Southern Ry. Co.*, 725 F.2d 1327, 1330-31 (11th

Cir. 1984)).  Appellants' notice of appeal filed before the district court resolved Sprint's request for a permanent injunction did not divest the court of jurisdiction to resolve that request, and decisions addressing a district court's authority to "alter or enlarge" (Opening Br. 46) the scope of a final judgment pending a timely appeal are inapposite.

### B.    The District Court Did Not Abuse Its Discretion in Granting the Injunction

The district court did not abuse its discretion by granting Sprint injunctive relief against Appellants' continued blatant and willful infringement.  To secure its injunction, Sprint had to demonstrate that: "(1) it ha[d] suffered an irreparable injury; (2) remedies available at law, such as monetary damages, [were] inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity [was] warranted; and (4) the public interest would not be disserved by a permanent injunction." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008) (citation omitted).  This Court reviews an order granting injunctive relief for an abuse of discretion.  *See S. Trust Metals, Inc.*, 894 F.3d at 1322.

Appellants concentrate their argument on the irreparable harm element.  Under the Lanham Act, however, Sprint is entitled to a

64

rebuttable presumption of irreparable harm given the jury's finding of infringement. *See* 15 U.S.C. § 1116(a) ("A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction[.]"). Appellants cannot carry their burden to rebut this presumption—much less demonstrate that the district court abused its discretion. Instead, Appellants merely recycle their unpersuasive challenge to the jury's liability finding itself. *See* Opening Br. 47 (no evidence of harm); *id*. at 48-50 (abandonment).

Sprint presented evidence of trademark infringement and *actual* customer confusion. Sprint proved that it owns the Nextel Branding, that it continues to use the Marks in commerce today, that Appellants—through a years-long, bad-faith campaign—infringed upon and counterfeited that Mark, and that customers at trade shows expressed confusion to Sprint's witnesses as to Appellants' counterfeited products, well after Sprint began focusing its marketing efforts at the current customer base. *See* pp. 7-15, *supra*. This confusion was understandable given Appellants' concerted efforts to imitate Sprint's Marks, using identical, public-facing signage, color schemes, and logos to copying

65

verbatim Sprint's trademark applications for the Nextel Branding. *See* pp. 13-15, *supra*. And Appellants continued—and, indeed, continue still—to pursue their infringement despite the USPTO's rejection of those applications on likelihood-of-confusion grounds. *See* pp. 15-18, *supra*; Dkt.385 at 10 (noting Appellants' "tacit admission" that they "continue to engage in infringing conduct"). The district court acted well within its discretion in determining that such blatant and continuing infringement did, and would continue to, irreparably harm Sprint.

As for the remaining factors, Appellants dedicate only two conclusory sentences, citing a single, unpublished case. *See* Opening Br. 50 (citing *Hoop Culture, Inc. v. Gap Inc.*, 648 F. App'x 981, 986 (11th Cir. 2016)). That is not enough to preserve an argument for this Court. *See Turner v. Soc. Sec. Admin., Comm'r*, No. 21-13590, 2022 WL 842188, at *2 (11th Cir. Mar. 22, 2022) ("An appellant forfeits an argument by making only passing references to it or raising it in a perfunctory manner without supporting arguments and authority." (internal citations and quotation marks omitted)).

But in any event, the district court also did not abuse its discretion in finding that those three factors favored entering the permanent

injunction. *See Stream, Inc. v. Barakat Food, Inc.*, No. 16-cv-24722, 2017 WL 7792613, at *3 (S.D. Fla. Oct. 4, 2017) ("Monetary damages are generally inadequate to compensate for past trademark infringement or the possibility of future infringement[.]"); *TracFone Wireless, Inc. v. Adams*, 98 F. Supp. 3d 1243, 1256 (S.D. Fla. 2015) ("[T]he public interest is advanced by enforcing faithful compliance with the laws of the United States and the State of Florida."); *Angel Flight of Ga.*, 522 F.3d at 1209 ("[T]he 'public interest' relevant to the issuance of a permanent injunction is the public's interest in avoiding unnecessary confusion."); *Edge Sys. LLC v. Aguila*, 186 F. Supp. 3d 1330, 1363 (S.D. Fla. 2016) ("[Plaintiff] runs the risk of loss of sales, goodwill, and damage to its reputation in the marketplace if [defendant] is allowed to continue his use of the marks at issue, whereas [defendant] faces no cognizable hardship, as he has no legal or equitable right to use the marks.").

## CONCLUSION

The district court's judgment should be affirmed.


Dated: April 17, 2023                    Respectfully submitted,

                                         */s/ Jonathan Y. Ellis*

Lucy Jewett Wheatley                     Jonathan Y. Ellis
Virginia Bar No. 77459                   North Carolina Bar No. 41220
Amanda L. DeFord                         McGuireWoods LLP
Virginia Bar No. 85511                   501 Fayetteville Street
Claire Hagan Eller                       Suite 500
Virginia Bar No. 90077                   Raleigh, NC 27601
McGuireWoods LLP                         T: (919) 755-6688
Gateway Plaza                            F: (919) 755-6588
800 East Canal Street                    jellis@mcguirewoods.com
Richmond, VA 23219
T: (804) 775-4320                        Marjorie G. McLean
F: (804) 698-2017                        North Carolina Bar No. 59090
lwheatley@mcguirewoods.com               McGuireWoods LLP
adeford@mcguirewoods.com                 201 North Tryon Street
celler@mcguirewoods.com                  Suite 3000
                                         Charlotte, NC 28202
                                         T: (704) 373-8044
                                         F: (704) 805-5044
                                         mmclean@mcguirewoods.com


*Counsel for Plaintiff-Appellee Sprint Communications LLC*

68

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,604 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Century Schoolbook style.

Dated: April 17, 2023                         */s/ Jonathan Y. Ellis*
                                              Jonathan Y. Ellis

                                              *Counsel for Plaintiff-Appellee*
                                              *Sprint Communications LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2023, I electronically filed the foregoing Brief with the Clerk of the Court using the CM/ECF system, which will send a notification of electronic filing to all counsel of record who are registered CM/ECF users.

I further certify that on the same day, four paper copies of the foregoing Brief were sent to the Clerk of this Court via Federal Express next-day delivery pursuant to 11th Circuit Rule 31-3.


Dated: April 17, 2023                    */s/ Jonathan Y. Ellis*
                                         Jonathan Y. Ellis

                                         *Counsel for Plaintiff-Appellee*
                                         *Sprint Communications LLC*